## CURTIN et al. v. GILDEA.

(District Court, D. Maryland. December 14 1923.)

1. **Principal and agent** &#9758;78(6)—**Evidence held to require finding that agent was not entitled to conduct fire insurance business as his individual business.**

In suit by partnership engaged in insurance business to compel agent in charge of branch office to account for profits received by him, evidence *held* to require finding against defendant's contention that he had notified his principals that he would after a certain date handle all fire insurance as his individual business, and that plaintiffs acquiesced by making no objection.

2. **Principal and agent** &#9758;66—**Letter of fire underwriters, rescinding certain privileges of agent's principals, held not to entitle agent to consider fire insurance business as his individual property.**

In action by partnership engaged in insurance business to compel accounting by agent, letter of local association of fire underwriters to agent, rescinding certain privileges theretofore granted defendant's principals, *held* not subject to construction which would preclude defendant from sharing commissions with principals on fire insurance written within city, or would entitle him to treat fire insurance thereafter written as his individual business.

3. **Evidence** &#9758;448 — **Rules of association, not ambiguous, are not subject to construction by testimony of officers or members.**

Where rules of association of fire underwriters are not ambiguous, testimony of officers and members of association as to their construction and understanding thereof is not admissible.

**4. Principal and agent** ⬅️78(5)—**Correspondence and evidence of local interpretation of fire underwriters' rules not admissible to show sharing of commissions permitted for many years violative of rules.**

In suit by partnership engaged in fire insurance business to compel accounting by local agent, correspondence between agent and local association of fire underwriters and their interpretation of association rules cannot be admitted as evidence of a peculiar and local interpretation forbidding plaintiffs to share in commissions of local agent, where for many years the sharing of such commissions had been permitted by the association.

**5. Principal and agent** ⬅️66—**Agent leading principals to believe he was accounting for profits not entitled to resist accounting on ground rules of fire underwriters association prohibited sharing profits.**

In suit by partnership engaged in fire insurance business to compel its local agent to account for profits, the agent who had appropriated commissions on fire insurance could not escape liability by asserting that his principals had disqualified themselves by reason of agreement with association of fire underwriters, where his course of conduct had led them to believe that he was accounting for profits of such business.

**6. Limitation of actions** ⬅️104(3)—**Principal and agent** ⬅️78(2¼)—**Limitations and laches held not to apply, where delay caused by concealment of defendant.**

Action by partnership engaged in insurance business against its agent to compel accounting of profits is not barred by laches, nor is Bagby's Code Md. art. 57, § 1, applicable where plaintiffs' delay was due to defendant's concealment of his appropriation of profits to his own use.

Supplemental Opinion.

**7. Principal and agent** ⬅️67—**Principal compelling accounting held entitled to recover interest.**

A principal recovering profits on business appropriated by agent during many years, for which it was his duty to account annually, is entitled both as a matter of right and in equity and justice to interest on the sums so appropriated.

In Equity. Suit by William W. Curtin and others, copartners trading as Johnson & Higgins, against John H. Gildea, Jr. Decree for plaintiffs.

Charles Markell and W. Calvin Chesnut, both of Baltimore, Md., for plaintiffs.

R. E. Lee Marshall and J. B. Diggs, both of Baltimore, Md., for defendant.

SOPER, District Judge. The object of this suit is to secure a judicial determination of the exact relationship which existed between the copartnership of Johnson & Higgins, of New York, the plaintiffs, and John H. Gildea, Jr., the defendant, who is admitted to have been in some respects at least the Baltimore representative of the firm. The bill of complaint prays the court to decree that the business conducted by the defendant in Baltimore was the business of the firm; that the defendant deliver to the plaintiffs the books, records, etc., of the office; and that he account for and pay over to the defendants the profits not heretofore paid by him.

The plaintiffs are copartners in the general business of insurance, with headquarters in New York City, and branches in Baltimore, Boston, Chicago, Detroit, Seattle, Los Angeles, San Francisco, and Montreal. The plaintiffs also have general control over a corporation of the same name, which has offices in New York, Philadelphia, and Chicago. The defendant has been in charge of the branch office in Baltimore since June 5, 1892. He admits the agency, so far as marine insurance is concerned, but denies the claim of the plaintiffs that the fire insurance business conducted by him in the same office was the business of Johnson & Higgins, asserting that it has been his own personal business since 1906.

In the year 1892, and prior thereto, Johnson & Higgins were represented in Baltimore by Harry Fisher. On June 5th of that year the agency was transferred to the defendant Gildea. There is evidence tending to show that prior to the change of agency the business of the Baltimore branch did not include fire insurance. However this may be, the business conducted by Mr. Gildea after his appointment as agent included not only marine but fire insurance. The contract between the parties called for the maintenance of an office in Baltimore in the name of Johnson & Higgins, and the division, between the firm and the agent, of all the profits, after the payment of a salary to the agent and necessary clerical and other expenses. During the period covered by the controversy in this case the salary of the agent was $1,800 per year, and the profits were to be divided equally.

On April 11, 1892, Mr. Gildea became connected with the Association of Fire Underwriters of Baltimore City, a local organization, hereinafter called the "Association," and after his appointment as agent for the plaintiffs, he endeavored to secure their election as members of the Association. Their application was rejected on July 11, 1892, but according to his testimony Mr. Gildea secured the permission of the Association to transact fire insurance business with the firm and to divide the commissions in accordance with his contract.

In order to facilitate the agent in the conduct of the business, the firm used its influence to secure for him the agency of a number of marine and fire insurance com-

panies. In 1894, when he obtained his first agency for a fire insurance company, he was thereby qualified for full membership in the Association and was duly elected thereto. At that time Mr. Gildea was a young man, and a contract with a well-established firm of insurance brokers was highly advantageous to him. There is correspondence in the early years indicating that he regarded himself as the agent in all respects of the New York firm and that the office and business generally were subject to their control.

The controversy in this case is mainly concerned with the matter of commissions on fire insurance passing through the Baltimore office between the 1st of January, 1906, and March 30, 1923, when the agency was terminated. The fire insurance in question is classified as local business and out of town business. As described by experienced witnesses, local fire insurance relates to insurance on property in Baltimore owned by residents of Baltimore; out of town fire insurance relates to insurance on property in Baltimore owned by nonresidents of the city. It is conceded in effect that all of the fire insurance of both kinds handled by Mr. Gildea from June 5, 1892, until January 1, 1906, was handled as the agent of Johnson & Higgins. He testifies, and his testimony is not contradicted, that during this period all of the profits from the local business were divided between himself and the firm, in accordance with the contract. It appears that the out of town business, written during this period, was handled in the following manner:

When the premiums were collected by the firm in New York, they deducted therefrom the share of the commissions to which out of town brokers were entitled, and the balance of the premiums and commissions were forwarded to Mr. Gildea. He then paid the premiums, less the balance of commissions, which were deposited by him with the receipts of other fire business, and were divided between him and the firm in the same way as the profits of the local business. The result of this manner of dealings was that the earnings of the Baltimore branch in both local and out of town fire insurance were treated in the same way as the earnings in marine insurance, and were divided in accordance with the contract.

It was the policy of the Association to confine local fire insurance business, and the profits therefrom, to its members. To accomplish this purpose, rule 5 (now rule 3) in 1892 provided: "Lines on Baltimore risks for account of Baltimore parties must be declined from any broker outside of Baltimore City." Baltimore risks of Baltimore parties meant local business. This rule was binding on Mr. Gildea as a member, but, as already pointed out, he secured the consent of the Association to his arrangement with Johnson & Higgins, so that in effect the firm enjoyed the same privileges as to local business as members of the Association.

The defendant testifies that so far as fire insurance is concerned, this manner of dealing ceased on January 1, 1906, by reason of a notification received by him from the Association of Fire Underwriters of Baltimore City, in the form of a letter dated February 16, 1906, hereinafter set out. He says that the effect of this letter was to withdraw from the New York firm the privileges which had been granted to them shortly after he assumed the agency in 1892, and that thereafter it was improper and against the rules for him as a member of the Association to divide the profits of the fire business with his principals; that he sent the letter of February 16, 1906, or communicated its contents to them, and that thereafter they knew that he was not accounting to them for the earnings of the Baltimore office in fire insurance, but was conducting such business for his own personal account, and appropriating the earnings to his own use.

This is the crucial point in the case. If the firm, from and after 1906, knew of the change in the handling of fire insurance by Mr. Gildea, and consented to the continuance of this business by him for his personal account, then of course they have no claim for an accounting for this business. If, on the other hand, they had no notice of the change, and, believing that Mr. Gildea was acting as their agent in the fire, as well as in the marine, insurance business after 1906, paid him the same salary, and assisted him in the business in the same way as before, and if he accepted the benefits of the contract, but failed to account for the fire commissions, then a very different case is made out, and it may well be that the plaintiffs are entitled to an accounting. It is for the court, therefore, to determine as a matter of fact whether Mr. Gildea did communicate to the firm the change of operation, and secure their consent.

The firm of Johnson & Higgins consists of 15 partners and has been in existence for many years. Some of the partners with whom Mr. Gildea negotiated in 1892 are now deceased, but a number of the present partners testified in the case. William R.

Coe, connected with the firm since 1893, a partner since 1903, and the managing head of the business from 1909 to 1916, testified, as indeed did other partners, that in all the branch offices of the firm, the entire business has always been conducted for the account of the firm, under an agency contract, including marine, fire, and other forms of insurance, and that they did not know that there was any difference in this respect as to the Baltimore office, or that the fire insurance business was not included therein. Mr. Coe, and other partners, testified that they were on intimate terms and held frequent conferences for many years with the partners who were in active charge in 1892, all of whom were living and active in 1916, and that no information of the character mentioned came to their attention.

William A. La Boyteaux, connected with the firm since 1894, the Philadelphia manager in the early years, manager of the San Francisco office from 1899 to 1915, a partner from 1905 to date, and managing head from 1916 to date, gave similar testimony. George V. Coe, connected with the company in the Philadelphia office from 1887 to 1894, manager of the Department of Fire Insurance in New York from 1894 to 1906, and partner with special interest in the fire department from 1907 to date, gave similar testimony, declaring that if a change were made in 1906 in the fire business in Baltimore, it would necessarily have come to his attention. Harry W. Lowe, connected with the office since 1899, a partner since 1910, and second in authority in the fire department in 1906, and now in charge of that department, gave similar testimony. Mr. Curtin, connected with the business since 1883, manager of the Philadelphia office from 1885 to date, and a partner since 1896, gave similar testimony, declaring that he attended many meetings during the past 30 years with the partners in New York.

The monthly and annual statements sent by Mr. Gildea to New York were not itemized, so as to show the source of commissions, but fire and marine commissions were included in one total. The totals for the years 1905, 1906 and 1907 gave no indication that in the latter years fire commissions were omitted. As early as 1918, it was noticed by the partners that the progress of the business in the Baltimore branch was small as compared with other branches. Attempts were made, without success, to persuade Mr. Gildea to consent to take a younger man in the office. For this purpose Mr. La Boyteaux visited him in Baltimore in 1918, and Mr. Coe in 1919. Nothing occurred to indicate that Mr. Gildea considered the fire business his own.

In 1920, a sharp interchange of letters took place in which the New York office complained that Mr. Gildea was not sending fire policies in the forms desired by customers, while Mr. Gildea contended that he was merely abiding by the rules of the Association of Fire Underwriters. This controversy, Mr. Gildea claims, was the cause of the breach; but the incident seems to have been closed in January, 1920, and it was not until December, 1921, that the real difference between the parties developed. In that month Mr. La Boyteaux again came to Baltimore and insisted that Mr. Gildea accept an understudy. He was promised that his own income as agent would not be curtailed. He flatly refused, and, upon being asked for his resignation, declared that he would not retire or give up the office, because the business belonged to him, and not to Johnson & Higgins. This was the first intimation, according to the plaintiffs' witnesses, which the firm had that Mr. Gildea did not regard himself in all respects the agent of the firm.

Subsequently, in January, 1922, Mr. Zimmer, the treasurer of the New York concern, was sent to Baltimore to make an examination of Mr. Gildea's books. His request was denied by Mr. Gildea, on the ground that Mr. Gildea's personal affairs and those of the firm were so inextricably mixed in the books that it was improper for him to turn over the books to the representative of the firm. As a matter of fact it is now conceded that the business of marine insurance, admittedly conducted by Mr. Gildea for the firm, was kept in separate books, entirely apart from the fire business, and that the marine books contained no entries of a nature personal to Mr. Gildea, but that all the entries related to the agency business.

Mr. Gildea's testimony, on the other hand, is to the effect that he communicated the letter of February 12, 1906, or its contents, to the officers of Johnson & Higgins. He is unable to remember whether he forwarded the letter, or communicated its contents, or whether he made his communication in writing or verbally. He is also uncertain as to the person or persons to whom the communication was made, but he declares that it was made, and that thereafter Johnson & Higgins knew the true situation. He makes no claim that the communication was made to any of the men who have been in active charge since 1906 and who are alive to-day.

A number of letters have been produced by both sides, showing incidents in the relationship of the parties, but no letters, or copies of letters, are produced by either side showing the communication which Mr. Gildea claims to have made. Under these circumstances, it is incumbent upon the court to decide whether the testimony given by the plaintiffs' witnesses or the testimony given by Mr. Gildea is entitled to the greater weight. There is nothing in connection with the testimony of the plaintiffs, which suggests inherent improbability. On the other hand, there are certain points in the testimony of Mr. Gildea which deserve consideration.

Mr. Gildea's reluctance to permit an examination of his marine books has already been noticed. In the next place, it is noteworthy that, in the negotiations between the parties after the controversy arose, Mr. Gildea repeatedly denied that Johnson & Higgins were ever interested at any time in the local fire insurance business of the Baltimore branch. In his answer to the bill of complaint, he states under oath that at no time was the firm interested in the local fire business in Baltimore. These statements, out of court and in the pleadings, are in marked contrast with the concession made during the trial of the case that all of the fire business was business of the firm for 14 years, from 1892 to 1906. Mr. Gildea's explanation is that, until he discovered certain correspondence of 1897, hereinafter referred to, and the letter of February 16, 1906, he had forgotten that for 14 years the fire business belonged to the firm. He admits, however, that this correspondence of 1897 and of 1906 was before him at the time he made his answer.

Equally important, as reflecting upon the weight which should be given to the testimony of Mr. Gildea on this important point, is the discovery which was made by Mr. Martyne, the assistant treasurer of the firm, who was permitted in May, 1923, just before the filing of the suit, to make an examination of the marine books in Mr. Gildea's office. It was developed in this examination that the reports made by Mr. Gildea from 1912 to date (prior records of Mr. Gildea having been destroyed by him), of the commissions received by him, corresponded precisely with the totals of the commissions as shown by the marine books. An examination of the commission account in the ledger, however, disclosed that in some 22 instances between 1912 and 1923, Mr. Gildea had borrowed from the funds of the marine business on deposit sums of money aggregating $11,141.46, of which $8,856.46 remained due at the time of the audit in 1923; $2,500 was unaccounted for in 1912, and $5,000 in 1921. The explanation given of this shortage is that Mr. Gildea was ignorant of it. His bookkeeper testified that the loans were lost sight of through the method of bookkeeping. The reason for the loans was said to be that the New York office sent a large volume of out of town fire business to the Baltimore office, but did not pay the premiums promptly enough to enable Mr. Gildea to settle on the 27th of each month, as required by the rules of the Association. Hence money in the marine account was temporarily used, with the intention to return it. The borrowing in this manner of funds and the repayment of the loans is customary in insurance offices in Baltimore, according to the testimony of reputable brokers. Mr. Gildea offered to make good the shortage after it was discovered by Mr. Martyne.

[1] In view of all of these circumstances, I am constrained to hold, so far as this contradiction of testimony is concerned, that the preponderance of evidence is with the plaintiffs, and the conclusion is reached that Mr. Gildea did not notify his principals in 1906 that thereafter the fire business would be conducted for his personal account, but, on the other hand, no such notice was given, and thereafter and until December, 1921, at least, the New York office continued to do business with Mr. Gildea under a mistaken misapprehension that he was sharing with them, not only the profits of the marine, but also the profits of the fire business. It follows that an accounting is due, unless there is some other defense upon which the defendant may rely.

Such a defense is sought in the claim that Johnson & Higgins were bound by the rules of the Association, and that these rules forbade Mr. Gildea to share the commission on local fire insurance with the firm. As already pointed out, Mr. Gildea became connected with the Association in 1892, and became a formal member thereof in 1894. In the same year of 1892 the firm of Johnson & Higgins were refused membership in the concern, but Mr. Gildea was authorized by the Association to carry on the fire business and divide the profits with the firm in accordance with his contract. It was undoubtedly the purpose on the part of the Association to confine the business of placing local fire insurance to local Baltimore brokers, but it appears that the Association pre-

ferred to permit Johnson & Higgins to be represented by Mr. Gildea of Baltimore rather than run the risk of a rate war.

In 1897 there was certain correspondence between the principals and the agent, and between the agent and the Association, having reference to certain practices of the firm in Baltimore. It appears that the firm was placing certain fire insurance on Baltimore property at less than Association rates, through certain representatives in Baltimore who were not members of the Association. The Association demanded that the firm agree not to place any business in Baltimore except through Mr. Gildea, who was bound by its rules. This agreement seems to have been made subject to certain exceptions approved by the Association, relating to property not owned in Baltimore, or to property owned in Baltimore, but included in schedules with other property elsewhere situated and belonging to common carriers, estates, etc. The attitude of the Association is shown by the following letter:

"The Association of Fire Underwriters of Baltimore City.

"Inspection and Rating Department.

"406 Water Street.

"Baltimore, Md., Oct. 26, 1897.

"John H. Gildea, Jr.—Dear Sir: I am directed by the committee to acknowledge receipt of your letter of 20th instant inclosing one addressed to you by Messrs. Johnson & Higgins dated 19th instant. The committee understands from the latter that Messrs. Johnson & Higgins will place through you all the fire insurance they may have to arrange on property situated in Baltimore, with the exception therein made. Those exceptions we understand to mean:

"First. Baltimore property included with other risks in railroad or steamship companies schedules.

"Second. Property not owned in Baltimore.

"Will you kindly ask Messrs. Johnson & Higgins whether the above correctly expresses their meaning, and, if so, whether the committee may consider that the agreement to above effect is from this time in effect.

"Respectfully, Wm. Cunningham,
"Sec. Executive Committee."

The evidence does not disclose any further development in the matter until 1906. On February 16, 1906, the association sent the following letter to Mr. Gildea:

"Association of Fire Underwriters of Baltimore City.

"Baltimore, Md., Feb. 16, 1906.

"John H. Gildea, Jr., Esq., 4 and 5 Abell Building, City—Dear Sir: The executive committee, after mature thought and most careful consideration, has determined that it does not possess the authority to permit any member of the Association of Fire Underwriters of Baltimore City to violate, ignore, or evade the operations of rule V, which provides that 'lines on Baltimore risks for account of Baltimore parties must be declined from any broker outside of Baltimore City.'

"In furtherance of the above, you are hereby respectfully notified that the privileges granted you under letter from Secretary Cunningham, dated October 26, 1897, are hereby rescinded.

"Very truly yours, Charles E. Willet, Secretary Executive Committee."

There is nothing in the evidence offered by either party to the cause which throws any light on the circumstances under which this letter was sent. As already explained, the plaintiffs deny that they had any notice thereof. Mr. Gildea on his part offers no explanation of the circumstances which gave rise to the letter. Indeed, he testifies that he had completely forgotten the letter until he discovered it in looking through his papers after the controversy arose. He contends, however, that the meaning of the notice was that the permission given him to share profits on local business with his principals under which he had operated since 1892, was thereby withdrawn.

[2] It may be assumed that, from the standpoint of the Association, notice to Mr. Gildea was notice to the firm, yet on its face the letter does not have the broad significance contended for. The privileges rescinded were those granted by the Association's letter of October 26, 1897. It is impossible to read the correspondence in October of 1897, between Johnson & Higgins and Mr. Gildea, and between the latter and the Association, without reaching the conclusion that the purpose that the Association had in mind was to require the firm to place all of its local fire insurance in Baltimore through Mr. Gildea. The firm objected on the ground that there were certain cases in which property of Baltimore owners, residing in Baltimore, was grouped with other property belonging to the same owners, and located elsewhere, and embraced in the same schedule. The Association recognized the propriety of making an exception of such

scheduled property, and agreed that Johnson & Higgins need not place such insurance, even though it should be local insurance, through Mr. Gildea. So far as can be ascertained from the correspondence, the privilege granted by the letter of October 26th related only to this exceptional scheduled property. It did not include the permission to the firm to place insurance generally through Mr. Gildea. That privilege had been granted in 1892, and was taken as a matter of course by all the parties to the correspondence of 1897. If the letter of February 16, 1906, had actually been received by Johnson & Higgins, it would not have conveyed the intelligence that the permission to place local insurance through Mr. Gildea had been withdrawn from the firm. Nor does reference to rule 3 indicate that it was the intention of the Association to apply to it so as to forbid Mr. Gildea to deal with Johnson & Higgins, as he had done during the prior 14 years. If so radical a departure had been intended, there would have been as a matter of course some clear expression of purpose. The rule is obviously cited as conflicting with the privilege granted to Johnson & Higgins in 1897, and is given as the reason for the withdrawal of that privilege.

Mr. Gildea contends, however, that he understood the letter to include all of the privileges theretofore granted by the Association to Johnson & Higgins, including the right of Johnson & Higgins to share commissions on local business with him. Yet he remembers nothing of the communication of this radical departure of the Association. Nor did he communicate the change to his principal. He simply took over the fire business and ceased to account for local business. Furthermore, he also ceased, without notice, to account for out of town business. Yet confessedly rule 3 does not apply to out of town business, and he points to no other rule or order of the Association which prevented him from sharing the out of town business with the firm. The evidence does not justify the assumption that Mr. Gildea ceased to account because he was compelled by the Association to do so.

The period from 1906 to date divides itself in two parts—1906 to 1912, and 1913 to date. Between the years 1906 and 1912, the amount of fire insurance placed by Mr. Gildea was relatively small. The fire insurance books prior to 1912 were destroyed by Mr. Gildea some seven or eight years ago. There is no record extant from which the amount of local business can be ascertained.

Mr. Gildea testifies that the net profits of the fire business of his office between 1906 and 1912 were between $2,000 and $3,000. In 1912 additional lines of insurance were secured by Gildea, which very greatly increased the profits, so that they averaged at least $10,000 a year between 1912 and the termination of the agency. As to these later years, Mr. Gildea's books show clearly the details of operation, and the precise amounts can be ascertained.

The contention of the defendant seems to be that as to the period between 1906 and 1912, there can be no accounting because there are no records in existence, and furthermore that Johnson & Higgins are not entitled to share the profits of the local fire business after 1912 because in 1913 and subsequent years they obligated themselves by a formal contract to obey the rules of the Association.

The argument is based upon the fact that in 1911, the Association adopted a rule as to nonresident brokers, the effect of which was to require them to apply for and receive a license from the Association, agreeing in the application to abide by the rules. Resident brokers were forbidden to accept any business of any sort from a nonresident broker who had not secured such license. Johnson & Higgins did apply and secure such a license in each year between 1913 and 1923, except 1914 and 1915.

The rule laid down for the issuance of such license contains a particular reference to rule 5 (or rule 3 as it appears in the present edition), which is substantially quoted in the letter of February 16, 1906. The contention is that even if Johnson & Higgins had no notice from the Association or from Mr. Gildea that the permission given for sharing profits had been revoked, nevertheless Johnson & Higgins, obligated themselves to keep the rules, including rule 3 in question, as understood by the insurance trade in Baltimore.

[3] Rule 3 in terms does not forbid a resident member of the Association from acting as agent of a nonresident member, and sharing commissions with him, nor does it apparently apply to local insurance placed by an agent in Baltimore through his own efforts, but is confined to local insurance, sent from brokers outside of Baltimore to members of the Association in Baltimore. Mr. Gildea testifies and he is corroborated by Mr. Coale, the present chairman of the executive committee of the Association, that rule 3 is understood in Baltimore to forbid members of the Association from sharing

commissions with any outside broker, or accepting risks on Baltimore business from such broker. This construction is said to apply even to the case of a resident broker who holds a power of attorney or represents a nonresident broker. Neither Mr. Gildea nor Mr. Coale gives evidence of any other case in Baltimore involving a similar relationship as that which Mr. Gildea held to Johnson & Higgins, but they contend that the rule is broad enough even to cover such a relationship.

It is difficult to see how the opinion of these witnesses can be received in construing the rule in question. Although evidence of custom and of the meaning of uncertain terms in an agreement may be received in an interpretation thereof, a careful consideration of the terms of this rule do not reveal such uncertainty.

At this point the distinction between local and out of town fire insurance business should be again noted. No rule has been pointed out which forbids an out of town broker, duly licensed by the Association, from sending out of town business to a member of the Association, or which forbids that member from sharing the profits of the business with an out of town broker.

As the conclusion has been reached that the firm had no notice of the change of operations, and did not give its consent to the applying by Mr. Gildea of the profits on both kinds of business to his own use, it follows that whatever may be the obligations of the firm to keep the rules of the Association after 1912, the firm is entitled to an accounting from Mr. Gildea on the out of town business.

[4] Nor is the result different with regard to the local business. The observation already made as to the failure of the Association to give notice to Mr. Gildea or Johnson & Higgins to abandon the practice of many years is applicable here. Assuming that in 1913, and subsequent years, when Johnson & Higgins applied for a nonresident broker's license, and agreed to abide by the rules of the Association, they had notice of the letter of February 16, 1906, and of the terms of rule 3, nevertheless it cannot be held that they obligated themselves to abide by rule 3, in accordance with a peculiar local interpretation, when the Association itself, the other party to the contract, had expressly permitted a division of profits on local business during a long period of years and had never withdrawn this permission. The letters of February 16, 1906, and of 1897, justified the firm in concluding that they had the right not only to share profits

on local business procured by Mr. Gildea in Baltimore, but also on local business sent by the firm of Mr. Gildea. A letter of May 4, 1917, from the fire department of Johnson & Higgins to Mr. Gildea indicates that at that date Johnson & Higgins considered themselves in effect members of the Association. The conclusion is that evidence of the peculiar and local interpretation of rule 3 cannot be received in this case to alter the natural meaning of the words, particularly in the face of the practice of many years tolerated by the Association.

[5] There is, moreover, another consideration which makes the construction of the rule contended for by the defendant unimportant. This is not a case between Johnson & Higgins and the Association, concerning a contract between them. It is a suit by the firm against Mr. Gildea. The finding of facts above set out justify the statement that Mr. Gildea availed himself of the privileges of the agency, and of the influence and assistance of Johnson & Higgins, without disclosing to them that he was not carrying out his part of the contract, which included accounting for the profits of the fire insurance business. This being the case he cannot escape the liability to account for these profits by setting up the contention that the firm had disqualified itself from receiving the profits by reason of its contract with the Association. His course of conduct unquestionably led the firm to believe not only that he was accounting for profits on the fire business, but also that such a course was not in conflict with the contract between the firm and the Association. So far as the firm knew, the permission of the association was still valid.

Even if it be conceded that the contract between Johnson & Higgins and Mr. Gildea was void, because it conflicted with the contract between the firm and the Association, nevertheless Mr. Gildea must account for the profits. He cannot retain the benefits without accounting for the liability of the agency. To say the least, he is under an implied obligation to make compensation for the benefits which he received. The only fair measure of this obligation is found in the terms of the supposedly invalid contract between himself and his principals.

[6] The defendant also contends that the bill of the plaintiffs should be dismissed because they have been guilty of laches, and also that the Maryland statutes of limitations, with reference to actions at law (see Bagby's Code, article 57, section 1), is applicable on the ground that this is a case in which there is concurrent jurisdiction at law

as well as in equity, and that in such case, a court of equity will apply the statute of limitations. It is true that the plaintiffs are seeking to recover profits earned over a long period of years, but neither the doctrine of laches nor the statute of limitations can be invoked to defeat their claim since their failure to assert their rights at an earlier date is due to concealment of facts on the part of the defendant. No complaint has been made that the interval between December, 1921, and the institution of the suit is so long as to justify an inference of laches. On the contrary, the evidence seems to indicate that during this period the parties were engaged in negotiations.

It follows that the plaintiffs are entitled to the relief prayed. A decree will be signed to give effect to the conclusions herein reached, the precise form of such decree to be determined after further conference with counsel in the case.

## Supplemental Opinion.

A decree was signed, in this case on December 21, 1923, whereby the liability of the defendant to account to the plaintiff for money due and owing was determined. By stipulation of the parties, filed herein on January 26, 1924, it was agreed that the principal sum due in accordance with the terms of the decree was $81,360.69, and that, if it shall be determined by the court that the plaintiffs are entitled to interest, the amount of interest on the plaintiffs' share of net profits from the insurance business other than marine insurance is $30,558.46, and that the amount of interest on plaintiffs' share of the net profits of the marine insurance business is $1,470.31, or a total of $32,138.77. The stipulation does not concede, but specifically denies, the plaintiffs' right to recover any sum—principal or interest.

[7] The question to be determined now is the right of the plaintiffs to interest. In the opinion of the court, interest is recoverable as of right by the plaintiffs, since the defendant kept in his hands funds belonging to his principal, which it was his duty to account for and pay over anually to the plaintiffs. Moreover, it is the opinion of the court that, even if the plaintiffs are not entitled, as a matter of right, to interest on the sum found to be due by the defendant, and the matter is one within the discretion of the court, nevertheless the plaintiffs, under the circumstances of the case, are in equity and justice entitled to interest.